PLANTE HUGUENIN LEBOVIC KAHN LLP
BRIAN C. PLANTE, Bar No. 175585
   *bplante@phlklaw.com*
PRESTON L. BROCK, Bar No. 344465
   *pbrock@phlklaw.com*
18100 Von Karman Ave., Ste 700
Irvine, CA 92612
Telephone: (949) 271-8700
Facsimile: (949) 627-2611

Attorneys for Plaintiff Brian J. Meshkin

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN JAVAADE MESHKIN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NUMBER:<br><br>2:24-cv-07768<br><br>**COMPLAINT FOR DAMAGES** |
| Related Case:<br> USDC Central District of California<br> Case No. 8:21-cr-00112-JLS<br><br>UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN JAVAADE MESHKIN, et al.,<br><br>Defendants. | |

/ / /

/ / /

Plaintiff Brian J. Meshkin, by and through his attorneys, alleges as follows:

# I.    JURISDICTION AND VENUE

1.    This court has jurisdiction over the claims asserted against Defendant UNITED STATES OF AMERICA on the grounds that the claims arise under the Federal Tort Claims Act, 28 U.S.C.S. §§ 2671–2680, and this court has subject matter jurisdiction over such claims pursuant to 28 U.S.C.S. § 1346(b).

2.    On July 13, 2023, more than six months before this action was instituted, the claims set forth herein were presented to the Department of Justice. The Department of Justice having failed to make a final disposition of the claims within that time, Plaintiff Brian J. Meshkin deems such failure to be a denial thereof.

3.    All acts and omissions complained of herein occurred in the Central District of California.  Plaintiff Brian J. Meshkin was a resident of the State of California during all of the acts and omissions complained of herein.

# II.    PARTIES

4.    Plaintiff Brian J. Meshkin ("Mr. Meshkin") is currently a resident of the State of Utah.

5.    Defendant UNITED STATES OF AMERICA ("Defendant" or "Government") for all purposes relevant hereto, acted by and through the Department of Justice ("DOJ"), the governmental entity which oversaw, directed, and controlled the criminal investigation and prosecution of Mr. Meshkin in the underlying matter of *United States of America v. Brian Javaade Meshkin, et al.* [Case No. 8:21-cr-00112-JLS].

# III.    GENERAL ALLEGATIONS

6.    In 2009, Mr. Meshkin founded Proove Biosciences, Inc. ("Proove"), a molecular diagnostic company focused on helping solve the dueling public health crises of chronic pain – the nation's most prevalent and expensive health condition contributing to 10% of all suicides in America – and opioid abuse – one of the nation's leading causes of preventable death.  Proove operated a high-complexity

CLIA-certified and CAP-accredited medical laboratory in Irvine, CA where it performed genetic testing. Proove developed proprietary predictive algorithms analyzing genetic and non-genetic factors to assist doctors in objectively assessing pain, predicting opioid misuse, and providing treatment insights for effective pain reduction, treatment, and management. Proove was incorporated in Delaware in 2009 and registered to do business in California in 2010 with its headquarters located in Irvine, California. At all times relevant to this action, Mr. Meshkin was the Chief Executive Officer and majority shareholder of Proove.

7.      In or around June of 2011, after 18 months of research and development, Proove launched its First Test Algorithm (Proove Opioid Risk – named Proove Narcotic Risk at the time) which was developed to determine, through medical testing, a patient's genetic predisposition to opioid addiction, and in turn, the best course of treatment for pain management. Proove's unique testing capabilities have tremendous social and economic value given the ongoing and worsening opioid epidemic.

8.      By approximately 2013, Proove had grown to over 150 employees, had contributed to numerous peer-reviewed articles published in medical journals, had its research recognized by leading medical societies including the American Society of Interventional Pain Physicians (ASIPP), the American Academy of Neurology (AAN), the American Society of Addiction Medicine (ASAM), and the American Society of Regional Anesthesia (ASRA), and had developed and launched two additional companion tests – Proove Drug Metabolism to provide insights around specific medications and Proove Pain Perception to help clinicians better assess patient self-reported pain scales based on differing pain thresholds or sensitivities.

9.      In addition to providing tests to physicians, Proove was engaged in clinical trials to further confirm and document the efficacy and usefulness of its tests to support regulatory review, as well as reimbursement from various types of insurers. To facilitate the assimilation of mass data, Proove developed clinical study

protocols with its Medical Advisory Board members. These protocols were then reviewed, approved, and overseen by numerous Institutional Review Boards (IRB) licensed by the U.S. Department of Health and Human Services (HHS) Office of Human Research Protections (OHRP) and listed on the National Institutes of Health (NIH) website ClinicalTrials.gov. Those clinics and hospitals that participated in clinical research services signed a Professional Services Agreement, and the physicians ("Study Investigators") were compensated for their time in providing commercially reasonable clinical research services, as outlined in the IRB-approved clinical study protocol and in their Professional Services Agreement. The clinical research services included but were not limited to patient-specific data regarding the use of the tests and their effect on the patient's treatment and outcomes, as well as documenting metrics for the clinical studies. The Study Investigators' time devoted to the clinical trials is well-documented, as they were required to complete and submit a Physician Clinical Research Services Form and Timesheet which contains information regarding the date, description, and duration (down to the minute) for the clinical research services required by the clinical study protocol and Professional Services Agreement, and a certification by the Study Investigators who completed the clinical research work and corresponding Physician Clinical Research Form and Timesheet. Study Investigators were not compensated for recommending or ordering tests. Rather, Study Investigators were paid only for the time performing clinical research services at an independently determined fair market value.

10.    On or about December 6, 2013, Proove filed a Provisional Patent application, which included a full description of its research and development model, including the physician compensation model, to the Government. Proove subsequently filed a Utility Patent application which was submitted to the U.S. Patent & Trademark office seeking governmental approval of its innovative business practices.

/ / /

11.     In approximately May 2014, Proove began accepting payments for its tests from Medicare.  At all relevant times, Proove continuously engaged outside consultants to provide recommendations and guidance regarding legal and regulatory compliance with all facets of its business operations, including without limitation, its Study Investigator compensation model, and specifically, Study Investigator reimbursements for time spent performing clinical research services, and was in compliance with applicable laws and regulations.

12.     On or about August 19, 2014, Proove obtained credentialing with the Center for Medicare and Medicaid Services as a clinical laboratory.

13.     In 2015, to further its commitment to compliance with applicable laws and regulations, and without any requirement by any regulatory agency or its outside investors, Proove sought to pursue the highest standards and recruited and appointed a distinguished Board of Directors, an Industry Advisory Board, and created a Compensation and Audit Committee of the Board of Directors to provide external review of Proove's business operations, compliance practices, and physician compensation model.  This Board of Directors included the former Secretary of the U.S. Department of Health and Human Services, the former Chief Compliance Officer of The Cleveland Clinic, the former head of the life science practice at Ernst & Young, and a member of the Board of Directors of CVS Health. A member of the Industry Advisory Board included the former Acting Administrator of the Centers for Medicare and Medicaid Services.

14.     On or about December 21, 2016, Mr. Meshkin was informed of a salacious article published by *STAT News* spreading false allegations and misinformation about Proove.  Due to the seriousness of the allegations, Mr. Meshkin instructed Proove's internal and external legal counsel to contact the DOJ to open a dialogue with both the Central District and Southern District offices to explain its clinical study protocol and refute the false allegations in the *STAT News* article.  The same day, Proove legal counsel began discussions with the DOJ.

15.     On or about February 20, 2017, Mr. Meshkin became aware of a subsequent article published by *STAT News* making even more serious allegations about Proove, including accusations of Medicare fraud. Proove's legal counsel continued its discussion with the DOJ, offering to share relevant documentation regarding its billing protocol for clinical studies, answer any questions the DOJ may have, and to conclusively refute the unfounded allegations in the *STAT News* articles.

16.     On or about May 22, 2017, Mr. Meshkin learned that the DOJ improperly posted two whistleblower lawsuits on the public PACER database which had not been unsealed. Proove's legal counsel informed the DOJ of this violation of the Federal whistleblower statutes and requested that the DOJ remove this illegal posting from PACER, as several law firms, including Mintz Levin, had posted online articles discussing the lawsuits – which were eventually dismissed. Representatives from the DOJ agreed to remove the improper publication of these sealed documents from PACER on Friday, May 26, 2017.

17.     On or about May 30, 2017, Special Agent Leah Chambers ("SA Chambers") from the Federal Bureau of Investigation ("FBI") San Diego Field Office (Southern District) filed an Application for Search Warrant (the "Application") in the United States District Court for the Central District of California, seeking to search Proove's offices for evidence of a crime. SA Chambers' sworn affidavit in support ("Chambers Affidavit") was attached to the Application.

18.     Mr. Meshkin is informed and believes and based thereon alleges that the Chambers Affidavit knowingly and intentionally misrepresented and fabricated evidence, or the existence of supposed evidence, to the Court in order to obtain approval of the Application despite lacking sufficient probable cause that a crime had been committed. SA Chambers' misrepresentations are numerous and include, *inter alia*, withholding information which severely compromised the credibility of

the Government's alleged informants, misrepresenting emails so as to eviscerate their true meaning and imply unsupported conclusions, and misrepresenting SA Chambers' limited knowledge of the biotechnology field in general and Proove's business practices specifically.

19.    The Court approved SA Chambers' Application and issued the requested search warrant on or about May 30, 2017.

20.    Mr. Meshkin is informed and believes and based thereon alleges that neither SA Chambers nor Assistant United States Attorney Joseph Green ("AUSA Green") sought or received express approval from the United States Attorney for the Southern District of California prior to submitting the Application targeting Mr. Meshkin and Proove.  Additionally, the DOJ's Justice Manual states that "before seeking judicial authorization for the search warrant, the federal prosecutor *must* consult with the [DOJ's] Criminal Division."  Upon information and belief, Mr. Meshkin alleges that neither SA Chambers nor AUSA Green consulted with the DOJ's Criminal Division before submitting the Application to the Court.

21.    On or about June 7, 2017, under the direction and control of SA Chambers and AUSA Green, also from California's Southern District, FBI agents executed a search of Proove's Irvine office, seizing vast quantities of evidence, including thousands of electronic and physical documents clearly marked as being protected by the attorney-client privilege and/or as attorney work product.  Many of the protected/privileged documents were taken from the office of Proove's then Chief Legal Officer, Laura Hunter.

22.    Mr. Meshkin is informed and believes, and based thereon alleges, that SA Chambers and/or AUSA Green failed to properly utilize a Privilege Team during the June 7, 2017 search of Proove, in direct violation of DOJ "privilege" procedures for executing "searches and seizures of business organizations where such searches involve materials in the possession of individuals serving in the capacity of legal advisor to the organization," as set forth in Title 9 of the DOJ's Justice Manual.

Specifically, SA Chambers and/or AUSA Green directed FBI agents, who were working directly with the AUSA Prosecution Team and actively involved in the underlying investigation of Proove, to search Chief Legal Officer Laura Hunter's office and seize massive quantities of privileged information.

23.     Mr. Meshkin is further informed and believes and based thereon alleges that Privilege Team lawyers were not available on or off-site to advise Prosecution Team agents during the course of the search, nor were any Privilege Team instructions and/or procedures issued by SA Chambers or AUSA Green in advance of the search in order to minimize the intrusion into privileged material.  The Justice Manual mandates that "in all cases a prosecutor ***must employ adequate precautions*** to ensure that the materials are reviewed for privilege claims and that any privileged documents are returned to the attorney from whom they were seized."

24.     The DOJ's Justice Manual identifies the need for instructions and procedures, as well as readily available Privilege Team lawyers as serving to "ensure that the Privilege Team does not disclose any information to the Prosecution Team unless and until so instructed by the attorney in charge of the Privilege Team."  Mr. Meshkin is informed and believes and based thereon alleges that SA Chambers and AUSA Green failed to comply with myriad DOJ "privilege" procedures, and as a result, the Prosecution Team reviewed attorney work product and attorney-client privileged material during the search and for approximately five years thereafter.  Compounding its tortious and unconstitutional misconduct, the Prosecution Team improperly utilized the seized privileged material in furtherance of its baseless prosecution of Mr. Meshkin.

25.     On or about June 21, 2017, a reverse proffer was held with AUSA Green and SA Chambers attending on behalf of the Government, along with Mr. Meshkin and his legal counsel, Orrick, Herrington & Sutcliffe LLP ("Orrick") attorneys Thomas McConville and Warrington Parker.  During the reverse proffer, AUSA Green, without any competent evidence of the commission of a crime,

1   threatened that Mr. Meshkin would be indicted and that Mr. Meshkin would be

2   convicted on all charges and would likely serve 20 years in prison.

3        26.     At the June 21, 2017 reverse proffer, AUSA Green stated that he had in

4   his possession a written legal opinion drafted by Proove attorney Charles I. Artz in

5   which he analyzed a recent federal court decision's impact on the practical

6   application of the Anti-Kickback statute to Proove's business practices, and his legal

7   advice as to how Proove's business practices could be improved upon to ensure

8   compliance with the Anti-Kickback statute.  AUSA Green then incongruously stated

9   that he had not read Artz's legal opinion, but that any privilege attached to it was

10  likely waived because Artz's opinion "did not advise Proove to create and collect

11  fraudulent" materials from the doctors.  At no point during the reverse proffer did

12  AUSA Green mention the existence of a Privilege Team, let alone that a privilege

13  review was ongoing.

14       27.     On or about August 3, 2017, Orrick requested a meeting with AUSA

15  Green and the Government's Prosecution Team for the purpose of providing

16  irrefutable exculpatory evidence in response to the presentation given by AUSA

17  Green and SA Chambers at the reverse proffer.

18       28.     On or about August 9, 2017, a meeting was held between Mr.

19  Meshkin's counsel, Orrick attorneys Thomas McConville, Warrington Parker, and

20  Lauren Seaton, and AUSA Green along with his Prosecution Team and SA

21  Chambers.  At the meeting, Orrick gave a detailed presentation rebutting any

22  criminal liability on the part of Mr. Meshkin and Proove as alleged by the

23  Government at the reverse proffer, which included more than 2,000 pages of

24  exculpatory documents validating Proove's business practices and physician

25  compensation model.  Orrick explained the significance of each exculpatory

26  document with respect to how it directly refuted any criminal liability as alleged by

27  the Government at the reverse proffer.

28  / / /

29.    Mr. Meshkin is informed and believes, and based thereon alleges, that AUSA Green violated DOJ procedures set forth in its Justice Manual by ignoring the vast quantities of exculpatory evidence presented at the August 9, 2017 meeting and continuing the Government's prosecution of Mr. Meshkin without probable cause to do so or any competent evidence of the commission of a crime.

30.    Mr. Meshkin is informed and believes, and based thereon alleges, that following the wrongful taking of confidential attorney client and attorney work product material by the Government's Prosecution Team, in direct violation of DOJ procedures and Mr. Meshkin's constitutional rights, SA Chambers knowingly drafted and entered fraudulent reports with the FBI Field Office in San Diego as part of a retroactive effort to conceal the violations of DOJ "privilege" procedures.

31.    Mr. Meshkin is informed and believes, and based thereon alleges, that as the Government's violation of his constitutional rights stemming from the June 7, 2017 search of Proove became more problematic for the AUSA Prosecution Team, SA Chambers continued to retroactively draft and enter fraudulent reports to cover-up the ongoing unlawful conduct.  By way of example and by no means inclusive of all fraudulent reports, Report No. 179 was purportedly drafted by SA Chambers just over one month after execution of the search warrant, but it was inexplicably entered more than nine months later.  Report No. 186 was purportedly drafted by SA Chambers just one week after execution of the search warrant; however, it was not entered by her until 16 months later.  Report No. 243 was purportedly *drafted* on August 28, 2018, more than a year after SA Chambers executed the search warrant, and includes a fabricated description of the methods utilized by a supposed Privilege Team, one that never existed, in seizing evidence from Proove on June 7, 2014. Report No. 243 was not entered by SA Chambers until July 20, 2021 – over four years after the search of Proove, nearly three years after it was supposedly drafted, and one month *after* Mr. Meshkin was indicted on June 9, 2021.

/ / /

32.     Mr. Meshkin is informed and believes, and based thereon alleges, that SA Chambers' reports are direct evidence of an intent to prosecute a case against him at all costs and without regard for the law or Mr. Meshkin's constitutional rights.  Mr. Meshkin is further informed and believes, and based thereon alleges, that Report Nos. 179, 186, and 243 were fraudulently drafted and entered by SA Chambers after-the-fact in response to the Government's misconduct in executing the search warrant and unlawfully obtaining voluminous attorney client and attorney work product privileged material coming to light and in an effort to cover-up the Government's misconduct and in furtherance of the prosecution of the meritless criminal case against Mr. Meshkin.

33.     Mr. Meshkin is informed and believes, and based thereon alleges that the misleading evidence in the Application and the false statements made in SA Chambers' Reports were further used in her, and likely others', Grand Jury testimony with the intent to aid AUSA Green in inducing the Grand Jury to issue an indictment of Mr. Meshkin and others when there was, in fact, no probable cause of the commission of a crime.

34.     Mr. Meshkin is informed and believes, and based thereon alleges that Report No. 243 was both ***drafted and entered*** by SA Chambers after the indictment was issued in order to "tie up any loose ends" before prosecution of the case could begin in earnest, despite SA Chambers' false claim that Report No. 243 was drafted on August 28, 2018, some three years earlier.

35.     On or about November 21, 2021, AUSA Green and his Prosecution Team attempted to circumvent the Government's investigative and prosecutorial misconduct by filing a motion with the District Court retroactively seeking a judicial finding that their review of Mr. Meshkin's privileged materials ("Privilege Motion"), which had been ongoing since on or about June 7, 2017, was proper. Notably, the DOJ's "privilege" procedures specifically state that, prior to seeking judicial approval of a search warrant, the Prosecution Team must decide "[w]hether

all documents will be submitted to a judicial officer or special master or only those which a privilege team has determined to be arguably privileged or arguably subject to an exception to the privilege." Mr. Meshkin is informed and believes, and based thereon alleges that, in direct violation of the DOJ's "privilege" procedures, the Prosecution Team falsely claimed to have properly utilized a Privilege Team to perform a review of Mr. Meshkin's privileged materials before submitting them for judicial review, when in fact, the Prosecution Team had already thoroughly reviewed the same long before filing its Privilege Motion on November 21, 2022.

36.     On or about December 2, 2022, Mr. Meshkin filed an Opposition to the Privilege Motion setting forth in detail the Government's misconduct, as well as violations of his constitutional rights and DOJ "privilege" procedures over the previous five years. In apparent acknowledgement of its falsehoods and misconduct, the Government withdrew its Privilege Motion on December 8, 2022. A hearing was held on or about December 15, 2022 during which Mr. Meshkin's defense counsel requested an evidentiary hearing for the purpose of uncovering the full extent of the Government's misconduct. The Court ordered the Government to file a written response to the request by "no later than **December 21, 2022**."

37.     On **December 21, 2022**, AUSA Green's Prosecution Team skirted accountability by moving the Court to dismiss the baseless criminal case in its entirety "in the interests of justice." With the proverbial shoe about to drop, exposing more than five years of improper and unlawful conduct, cover-ups, and violations of Mr. Meshkin's constitutional rights, and that there was, in fact, no evidence to support the initial Application nor prosecution of *any* criminal case against Mr. Meshkin, the Government finally abandoned its untethered crusade.

38.     The Government's wrongful conduct and baseless prosecution of Proove and Mr. Meshkin, including without limitation, securing a search warrant based on the material misrepresentation of known facts and without any probable cause of the commission of a crime, confiscating voluminous attorney client and

attorney work product privileged material without a Privilege Team resulting in numerous violations of Mr. Meshkin's constitutional rights, willfully misrepresenting the facts of the case in repeated publicly-disclosed press releases, securing a Grand Jury indictment based on known misrepresentations of material facts and concealment of material and exculpatory facts, ignoring extensive exculpatory evidence, violating DOJ "privilege" procedures, falsifying reports to cover-up Government misconduct, and continuing to prosecute a criminal case against Mr. Meshkin after being provided with irrefutable exculpatory evidence, resulted in (1) the demise of Proove; (2) Mr. Meshkin's corresponding financial ruin; (3) tremendous personal loss including a divorce (after twenty years of marriage); (4) his ex-wife using the indictment to discredit Mr. Meshkin, resulting in the loss of custody of his children; (5) tremendous damage to his professional reputation due to the controversy resulting in years of unemployment; (6) psychological turmoil; and (7) severe emotional distress resulting in extensive therapy and medical care.

39.    On or about October 4, 2023, Mr. Meshkin's attorneys retrieved the evidence seized during the June 7, 2017 search of Proove from the FBI's San Diego Field Office. Among the more than 300 boxes retrieved, one was nonconforming and it contained two of Mr. Meshkin's personal laptops (pictured below).

 

Neither laptop was stored at the two locations searched on June 7, 2017 – 15326 Alton Parkway, Irvine, California 92618 (Proove Headquarters) and 26 Technology Drive East, Irvine, California 92618 (Proove Medical Laboratories).  On the date of the FBI's search, both laptops were located at Mr. Meshkin's personal residence, then shared by his now ex-wife and former Proove General Counsel, Catherine Meshkin, Esq.  It is unclear how they came to be in the FBI's possession and no explanation has been offered.  Additionally, the nonconforming brown "STAPLES" box that the laptops were stored in by the FBI is identical to boxes that Mr. Meshkin used at his personal residence.  In fact, Mr. Meshkin regularly had a number of the identical Staples boxes at his personal residence due to regularly receiving shipments from Staples at his home address.  All other boxes retrieved from the San Diego Field Office were standard FBI evidence boxes – i.e., white, sealed with yellow tape, DOJ handling instructions printed on two sides, and the front marked with "Box" and "Item" designation numbers.  Below are photos of the "STAPLES" box and the standard FBI evidence boxes retrieved from the San Diego Field Office.

 

The "STAPLES" box has two stamps that are of particular note which read: (1) XRAYED FBI SAN DIEGO;  and (2) DTBRB 11/03/21 19:03:39.  The first appears to indicate that the box arrived at the San Diego Field Office by means different from those by which all other evidence boxes, given that the "STAPLES" box is the only one bearing the stamp (see below).

 

The second reinforces the conclusion that the "STAPLES" box arrived at the San Diego Field Office separately from all other evidence boxes, as it would have been applied at the time of manufacturing and/or distribution. Here, that date is November 3, 2021, more than four years after the June 7, 2017 search (see below).



40. At all times relevant herein, SA Chambers and AUSA Green were acting within the course and scope of their employment with Defendant and Defendant is liable, vicariously and by statute, for the misconduct alleged herein.

41. As a result of the Government misconduct alleged herein, including without limitation the baseless and/or unlawful investigation, search, indictment and prosecution of Proove and Mr. Meshkin, Proove's primary investor forced the

company into receivership and an eventual liquidation, and Proove essentially ceased business operations.  At the time of the liquidation Proove was experiencing tremendous growth, listed as one of North America's fastest growing companies on the Inc. 500 (#323) and Deloitte Technology Fast 500 (#69).  At the time, Mr. Meshkin had been selected as the CEO of the Year in Orange County, California, an EY Entrepreneur of the Year Finalist for two years, and many other awards for his executive and entrepreneurial achievements.

42.    In contrast with 30 years of favorable news coverage on Mr. Meshkin's positive community impact, including being named as an "Earthly Angel" in *The Baltimore Sun* for his successful efforts to save tens of thousands of children's lives by pioneering childhood bicycle helmet laws across the nation as well as "fighting prejudice, hunger, homelessness, domestic violence and cancer" and coverage on *CNBC* and the *Orange County Business Journal* as an award-winning entrepreneur helping reduce deaths in the opioid crisis, Mr. Meshkin now became the CEO of a "scandal-ridden company" indicted for fraud, as the Government knowingly published press releases with false statements reported in major media outlets such as the *Los Angeles Times*, *OC Register*, and *Baltimore Sun* accusing Mr. Meshkin of fraud.

43.    This wrongful initiation and prosecution of the criminal case resulted in catastrophic financial and reputational damage to Mr. Meshkin, in addition to incurring enormous legal fees to stave off the Government's witch hunt, and severe emotional distress arising from financial ruin and the threat of incarceration.

## IV.    COUNT ONE: NEGLIGENCE

44.    Mr. Meshkin incorporates by reference each and every paragraph of this Complaint necessary to state this cause of action as if set forth fully herein.

45.    Defendant, including without limitation SA Chambers and AUSA Green, owed a duty to Mr. Meshkin to act within the standard of care and Defendant breached that duty as alleged herein.

46.     Mr. Meshkin is informed and believes and based thereon alleges that Defendant, including without limitation SA Chambers and AUSA Green, breached the standard of care by, *inter alia*, providing incorrect and incomplete information in the Application, improperly executing the search warrant resulting in violations of Mr. Meshkin's constitutional rights, preparing and entering inaccurate and false investigative reports, providing incorrect and incomplete information to the Grand Jury in order to secure an indictment, ignoring exculpatory evidence provided by Mr. Meshkin's attorneys, concealing additional exculpatory evidence, continuing to prosecute the case against Mr. Meshkin in the absence of any evidence that a crime had been committed, misrepresenting the facts of the case in repeated publicly-disclosed press releases, and reviewing and utilizing privileged materials that were improperly obtained when the search warrant was executed.

47.     Defendant's negligent conduct, including without limitation SA Chambers and AUSA Green, violated the Constitution and DOJ "privilege" procedures as alleged herein, and therefore, Defendant, including without limitation, SA Chambers and AUSA Green did not have the authority or discretion to act in the manner described above.

48.     As a direct and proximate result of Defendant's negligence, as alleged herein, Mr. Meshkin has sustained damages in an amount to be proven at trial and in excess of the minimum jurisdictional limit of this Court.  Mr. Meshkin will show that he incurred substantial damages, also summarized in his administrative filing with the DOJ, totaling $730,804,375, in connection with, *inter alia*, the destruction of Proove, of which 96% of all outstanding shares were owned by him; loss of income; legal fees incurred defending himself; receivership costs; loss of future shareholder value and revenues; and catastrophic reputational damage.

///

///

///

## V.    COUNT TWO:  NEGLIGENT SUPERVISION

49.    Mr. Meshkin incorporates by reference each and every paragraph of this Complaint necessary to state this cause of action as if set forth fully herein.

50.    As set forth herein, the investigation and prosecution of Mr. Meshkin and Proove were spearheaded by SA Chambers and AUSA Green, who are based in the San Diego (Southern District), even though Proove and Mr. Meshkin were based in Irvine, California and the search warrant and subsequent criminal complaint were filed and prosecuted in the Central District.

51.    Mr. Meshkin is informed and believes and based thereon alleges that AUSA Green's supervisor was removed during the pendency of his case and was not replaced, and as a result, AUSA Green was left unsupervised during the investigation and prosecution of Mr. Meshkin.

52.    Mr. Meshkin is informed and believes and based thereon alleges that at all relevant times herein Defendant negligently supervised the conduct of its investigative and Prosecution Team, including without limitation SA Chambers and AUSA Green, and that said failure was below the standard of care and DOJ hierarchy and guidelines.

53.    Mr. Meshkin is informed and believes and based thereon alleges that the misconduct alleged herein was the direct and proximate result of Defendant's negligent supervision, as further evidenced by the disqualification of a majority of the FBI agents involved due to impropriety.

54.    Mr. Meshkin is informed and believes and based thereon alleges that Defendant did not have the discretion to deviate from established DOJ hierarchy and/or "privilege" procedures in executing its supervisorial functions as alleged herein.

55.    As a direct and proximate result of Defendant's negligent supervision, as alleged herein, Mr. Meshkin has sustained damages in an amount to be proven at trial and in excess of the minimum jurisdictional limit of this Court.  Mr. Meshkin

will show that he incurred substantial damages, also set forth in his administrative

filing with the DOJ, totaling $730,804,375, in connection with, *inter alia*, the

destruction of Proove, of which 96% of all outstanding shares were owned by him;

loss of income; legal fees incurred defending himself; receivership costs; loss of

future shareholder value and revenues; and catastrophic reputational damage.

## VI.    COUNT THREE:  MALICIOUS PROSECUTION

56.    Mr. Meshkin incorporates by reference each and every paragraph of

this Complaint necessary to state this cause of action as if set forth fully herein.

57.    Mr. Meshkin is informed and believes and based thereon alleges that

the Chambers Affidavit knowingly and intentionally misrepresented and fabricated

evidence, or the existence of supposed evidence, to the Court in order to obtain

approval of the Application despite lacking sufficient probable cause to suspect that

a crime had been committed.  SA Chambers' misrepresentations are numerous and

include, *inter alia*, withholding information which severely compromised the

credibility of the Government's alleged informants, misrepresenting emails so as to

eviscerate their true meaning and imply unsupported conclusions, willfully

misrepresenting the facts of the case in repeated publicly disclosed press releases,

and misrepresenting SA Chambers' limited knowledge of the evidence, the

biotechnology field in general and Proove's business practices specifically.

58.    The Court approved SA Chambers' Application and issued the

requested search warrant on or about May 30, 2017.

59.    On or about June 7, 2017, under the direction and control of SA

Chambers and AUSA Green, also from the Southern District, FBI agents executed a

search of Proove's Irvine office and seized vast quantities of evidence, including

thousands of electronic and physical documents clearly marked as being protected

by the attorney-client privilege and/or as attorney work product.  Many of the

protected/privileged documents were taken from the office of Proove's then Chief

Legal Officer, Laura Hunter.

60.    Mr. Meshkin is informed and believes, and based thereon alleges, that SA Chambers willfully failed to utilize a proper Privilege Team during the June 7, 2017 search of Proove, in direct violation of DOJ procedures for executing searches and seizures. Specifically, SA Chambers and/or AUSA Green directed FBI agents, who were part of the team working directly with the AUSA Prosecution Team prosecuting the case, to handle, seize and ultimately review Mr. Meshkin's and Proove's privileged information. Mr. Meshkin is further informed and believes and based thereon alleges that throughout this process, the Government reviewed and utilized attorney work product and attorney-client privileged material in furtherance of its baseless prosecution of Mr. Meshkin.

61.    Mr. Meshkin is informed and believes, and based thereon alleges, that following the willful taking of confidential attorney client and work product material by the Government's Prosecution Team, in direct violation of DOJ procedures and Mr. Meshkin's constitutional rights, SA Chambers knowingly drafted and entered fraudulent reports with the FBI Field Office in San Diego as alleged herein and as part of a retroactive effort to conceal the ongoing and substantial violations of the Constitution and DOJ "privilege" procedures.

62.    Mr. Meshkin is informed and believes, and based thereon alleges, that as the Government's violations of his constitutional rights stemming from the June 7, 2017 search of Proove became more problematic for the AUSA Prosecution Team, SA Chambers continued to retroactively draft and enter fraudulent reports to cover-up the ongoing unlawful conduct. By way of example and by no means inclusive of all fraudulent reports, Report No. 179 was purportedly drafted by SA Chambers just over one month after execution of the search warrant, but it was inexplicably entered more than nine months later. Report No. 186 was purportedly drafted by SA Chambers just one week after execution of the search warrant; however, it was not entered by her until 16 months later. Report No. 243 was purportedly *drafted* on August 28, 2018, more than a year after SA Chambers

COMPLAINT FOR DAMAGES

executed the search warrant, and includes a fabricated description of the methods utilized by a supposed Privilege Team, one that never existed, in seizing evidence from Proove on June 7, 2014.  Report No. 243 was not entered by SA Chambers until July 20, 2021 – over four years after the search of Proove, nearly three years after it was supposedly drafted, and one month *after* Mr. Meshkin was indicted.

63.    Mr. Meshkin is informed and believes, and based thereon alleges, that SA Chambers' reports are direct evidence of an intent to prosecute a case against him at all costs and without regard for the law or Mr. Meshkin's constitutional rights.  Mr. Meshkin is further informed and believes, and based thereon alleges, that Report Nos. 179, 186, and 243 were fraudulently drafted and entered by SA Chambers after-the-fact in a tacit acknowledgement of the Government's misconduct in executing the search warrant and unlawfully reviewing voluminous attorney client and attorney work product privileged material coming to light and in an effort to cover-up the Government's misconduct and in furtherance of the prosecution of the meritless criminal case against Mr. Meshkin.

64.    Mr. Meshkin is informed and believes, and based thereon alleges that the misleading evidence in the search warrant application and the false statements made in SA Chambers' Reports were further used in her, and likely others', Grand Jury testimony with the intent to aid AUSA Green in inducing the Grand Jury to issue an indictment of Mr. Meshkin and others when there was, in fact, no probable cause of the commission of a crime.

65.    Mr. Meshkin is informed and believes, and based thereon alleges that Report No. 243 was both *drafted and entered* by SA Chambers after the indictment was issued in order to "tie up any loose ends" before prosecution of the case could begin in earnest, despite SA Chambers' false claim that Report No. 243 was drafted on August 28, 2018, some three years earlier.

/ / /

/ / /

66.     Mr. Meshkin is informed and believes and based thereon alleges that each subsequent search-related report drafted and entered by SA Chambers shares three common elements evidencing her malicious intent: (1) the time between execution of the search warrant and drafting increases; (2) the time between drafting and entering increases; and (3) each subsequent Report includes substantially more information and detail related to the ***non-existent*** Privilege Team's role in seizing Proove's privileged information than the prior reports.  There was no Privilege Team and Mr. Meshkin is informed and believes that the contents of these Reports are fabricated to cover-up prior misconduct.

67.     Beginning on or about June 7, 2017 and continuing until the criminal case against Mr. Meshkin was dismissed in his favor on or about December 22, 2022, Mr. Meshkin's legal counsel repeatedly and unequivocally informed SA Chambers, AUSA Green and the Government's Prosecution Team that Mr. Meshkin as CEO and majority shareholder of Proove held all privilege related to materials seized during execution of the search warrant, that no privilege of any kind had been waived, and clearly communicated the names, locations, and descriptions of privileged and potentially privileged information held by Proove.

68.     On or after June 9, 2021, Mr. Meshkin's legal counsel raised questions and concerns about SA Chambers' handling of privileged information and documents post-seizure, whether SA Chambers' mishandling of privileged information and documents had resulted in privileged material being reviewed by AUSA Green and/or the Government's Prosecution Team, among other related concerns.  SA Chambers, either directly or through AUSA Green, denied any wrongdoing, insisted a Privilege Team was present at the search and acted in conformity with DOJ "privilege" procedures, and denied that Mr. Meshkin's rights had been violated.  AUSA Chambers knew these statements were false when made, and were a further attempt to cover-up the Government's ongoing misconduct and to continue with the Government's baseless prosecution of Mr. Meshkin.

69.     On or about August 9, 2017, a meeting was held between Mr. Meshkin's counsel, Orrick attorneys Thomas McConville, Warrington Parker, and Lauren Seaton, and AUSA Green along with his Prosecution Team and SA Chambers.  At the meeting, Orrick gave a detailed presentation rebutting any criminal liability on the part of Mr. Meshkin as alleged by AUSA Green at the reverse proffer, which included more than 2,000 pages of exculpatory documents validating Proove's business practices and physician compensation model.  Orrick explained the significance of each exculpatory document and how it directly refuted any criminal liability as detailed by AUSA Green at the reverse proffer.

70.     Mr. Meshkin is informed and believes, and based thereon alleges, that AUSA Green violated DOJ procedures by ignoring the vast quantities of exculpatory evidence presented at the August 9, 2017 meeting and continuing the Government's prosecution of Mr. Meshkin without probable cause to do so or any evidence of the commission of a crime.

71.     The Government's wrongful conduct and malicious prosecution of Mr. Meshkin, including without limitation, securing a search warrant based on the material misrepresentation of known facts and without any probable cause of the existence of a crime, improperly executing the search warrant and confiscating voluminous attorney client and work product privileged material without a Privilege Team resulting in violations of Mr. Meshkin's constitutional rights, securing a Grand Jury indictment based on known misrepresentations of material facts and concealment of material and exculpatory facts, violating DOJ "privilege" procedures, falsifying reports to cover-up Government misconduct, continuing to prosecute a criminal case against Mr. Meshkin after being provided with irrefutable exculpatory evidence, and concealing additional exculpatory evidence, resulted in the demise of Proove and Mr. Meshkin's corresponding financial ruin.

/ / /

/ / /

72.    At all times relevant herein, SA Chambers and AUSA Green were acting within the course and scope of their employment with Defendant and Defendant is liable, vicariously and by statute, for the wrongful conduct alleged herein.  Mr. Meshkin is informed and believes and based thereon alleges that SA Chambers and ASUA Green were not acting in the interests of justice but instead for their own personal and professional benefit, hoping to gain notoriety and recognition prosecuting a case they believed would get significant media attention in an industry that was at the time under heightened scrutiny by the Government.

73.    As a result of the Government misconduct alleged herein, including without limitation the baseless and/or unlawful investigation, search, indictment, and prosecution of Proove and Mr. Meshkin, Proove's primary investor forced the company into receivership and an eventual liquidation, and Proove essentially ceased business operations.  At the time of the liquidation Proove was experiencing tremendous growth as one of the fastest growing companies in North America, listed as #323 on the Inc. 500 and #69 on the Deloitte Technology Fast500.  The wrongful investigation and prosecution of the criminal case also resulted in catastrophic damage to Mr. Meshkin in the form of turmoil in his personal life resulting in a divorce after twenty years and loss of custody of his children, reputational damage leading to years of unemployment, and severe emotional distress arising from financial ruin and the threat of incarceration.

74.    Defendant's investigative and law enforcement officers, including without limitation SA Chambers and AUSA Green, were authorized to and in fact were actively involved in causing Mr. Meshkin to be investigated, searched, indicted, and prosecuted in the underlying criminal matter alleged herein.

75.    The underlying criminal proceeding ended in Mr. Meshkin's favor when the Court signed the Order on the Government's Motion to Dismiss "in the interests of justice."

/ / /

76.     Mr. Meshkin is informed and believes and based thereon alleges that no reasonable person in Defendant's circumstances would have believed that there were grounds for causing Mr. Meshkin to be investigated, searched, indicted or prosecuted in the underlying criminal matter as alleged herein.

77.     Mr. Meshkin is informed and believes and based thereon alleges that the Government misrepresented the evidence, concealed and ignored material exculpatory evidence in the investigation, improperly executed the search of Proove, secured an indictment based on fabricated evidence, violated DOJ "privilege" procedures, violated Mr. Meshkin's constitutional rights, misrepresented the facts of the case in repeated publicly-disclosed press releases, failed to use a Privilege Team thereby giving the Prosecution Team access to attorney work product and attorney client privileged material, falsifying official investigative and prosecutorial reports to cover-up misconduct, continuing to prosecute the criminal case in the absence of probable cause or any competent evidence that a crime had been committed (even after years of investigation and millions of dollars spent), contriving a false plea deal with a former Proove employee (that was later withdrawn) to give the appearance of favorable witness testimony, continuing to prosecute the criminal case despite being repeatedly provided with clear exculpatory evidence by Mr. Meshkin and his legal counsel.

78.     Mr. Meshkin is informed and believes, and based thereon alleges that when the Government provided evidentiary electronic files from Proove to his defense counsel during the criminal proceedings, the Government added the pejorative derogatory phrase, "F**k You" into the file names of the privileged electronic files returned to Mr. Meshkin's defense counsel.  This clearly demonstrates malicious intent. When Mr. Meshkin's defense counsel asked about the Government's renaming of electronic files, including privileged documents, with a file name inclusive of this derogatory phrase in a meet and confer letter, the Prosecution Team stated that the renaming of those files was a "technical glitch."

79.    Mr. Meshkin is informed and believes and based thereon alleges that Defendant, including without limitation SA Chambers and AUSA Green, acted for their own personal and professional gain rather than the interests of justice.

80.    As a direct and proximate result of Defendant's unlawful conduct, as alleged herein, Mr. Meshkin has sustained damages in an amount to be proven at trial and in excess of the minimum jurisdictional limit of this Court.  Mr. Meshkin will demonstrate at trial that he incurred substantial damages, also summarized in his administrative filing with the DOJ, totaling $730,804,375, in connection with, *inter alia*, the destruction of Proove, of which 96% of all outstanding shares were owned by him; loss of income; legal fees incurred defending himself; receivership costs; loss of future shareholder value and revenues; and catastrophic reputational damage.

## VII.    COUNT FOUR:  ABUSE OF PROCESS

81.    Mr. Meshkin incorporates by reference each and every paragraph of this Complaint necessary to state this cause of action as if set forth fully herein.

82.    Mr. Meshkin is informed and believes and based thereon alleges that Defendant, including without limitation SA Chambers and AUSA Green, caused Mr. Meshkin to be investigated, searched, indicted, and prosecuted in the underlying criminal matter alleged herein when there was never any probable cause of the commission of a crime, violated Mr. Meshkin's constitutional rights and DOJ mandates, falsified official reports, and continued to cause Mr. Meshkin to be prosecuted in the absence of any evidence that a crime had been committed and even after being provided with exculpatory evidence as alleged herein.

83.    Mr. Meshkin is informed and believes and based thereon alleges that the Government intentionally used these procedures for an improper purpose and not for the administration of justice for which they are intended as alleged herein.

/ / /

/ / /

COMPLAINT FOR DAMAGES

84.    As a direct and proximate result of Defendant's unlawful conduct, as alleged herein, Mr. Meshkin has sustained damages in an amount to be proven at trial and in excess of the minimum jurisdictional limit of this Court.  Mr. Meshkin will demonstrate at trial that he incurred substantial damages, also summarized in his administrative filing with the DOJ, totaling $730,804,375, in connection with, *inter alia*, the destruction of Proove, of which 96% of all outstanding shares were owned by him; loss of income; legal fees incurred defending himself; receivership costs; loss of future shareholder value and revenues; and catastrophic reputational damage.

## VIII.    COUNT FIVE:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

85.    Mr. Meshkin incorporates by reference each and every paragraph of this Complaint necessary to state this cause of action as if set forth fully herein.

86.    As a result of the Government misconduct alleged herein, including without limitation the baseless and/or unlawful investigation, search, indictment and prosecution of Proove and Mr. Meshkin, Proove's primary investor forced the company into receivership and an eventual liquidation, and Proove essentially ceased business operations.  At the time of the liquidation Proove was experiencing tremendous growth.  The wrongful initiation and prosecution of the criminal case and Defendant's extreme and outrageous conduct directly caused Mr. Meshkin to suffer severe emotional distress arising from financial ruin and the threat of incarceration to Mr. Meshkin, a divorce after twenty years of marriage where his ex-wife, the former General Counsel of Proove, used the indictment to deny Mr. Meshkin custody and visitation rights with his children, reputational damage, and prolonged multi-year unemployment.

87.    Defendant's conduct, including without limitation SA Chambers and AUSA Green, as alleged herein was extreme and outrageous and unbecoming of the institution of the DOJ.

88.    Defendant intended to cause Mr. Meshkin emotional distress and/or acted with reckless disregard for the probability that their conduct would cause him emotional distress.

89.    As a direct and proximate result of Defendant's unlawful conduct, as alleged herein, Mr. Meshkin has sustained damages in an amount to be proven at trial and in excess of the minimum jurisdictional limit of this Court.  Mr. Meshkin will demonstrate at trial that he incurred substantial damages, also summarized in his administrative filing with the DOJ, totaling $730,804,375, in connection with, *inter alia*, the destruction of Proove, of which 96% of all outstanding shares were owned by him; loss of income; legal fees incurred defending himself; receivership costs; loss of future shareholder value and revenues; and catastrophic reputational damage.

### IX.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Brian J. Meshkin prays for judgment as follows:

1.    For compensatory damages according to proof at the time of trial;

2.    For costs of suit incurred herein; and

3.    For such other relief as the Court deems just and proper.

Dated:  September 11, 2024          PLANTE HUGUENIN LEBOVIC KAHN LLP

By: _____
        Brian C. Plante
        Preston L. Brock
    Attorneys for Plaintiff Brian J. Meshkin

COMPLAINT FOR DAMAGES